Morning, Your Honors. David Riley here on behalf of Appellant Frontier Bank. I'm sure you're familiar with the briefs. Factually, I think the only issue that I consider important factually is that the $150,000 advanced by the bank went to the debtor. I don't think that's converted. To the extent that it is converted, we're here on summary judgment, so the facts are interpreted in my client's favor. And I think the affidavits clearly show the money was intended to go to the bank. The purpose of the loan was to fund the debtor's business operations. The money went to the bank. The money was given in exchange for the security interest. And the money, in fact, was used by the debtor in business operations. So that's the facts we're dealing with. I just wanted to try to clarify something. I would suspect that often in a situation like this, there would be a loan to the grocery company guaranteed by the shareholders. In this case, it's structured as a loan to the shareholders, but they're going to contribute it to the company. And in exchange, the bank also gets some security from the company, which is sort of like helping to guarantee the shareholders' obligation, I guess. Is this unusual that a loan be structured this way? I think it's fair to say the more usual structure in a loan would involve a guarantee. I think that's fair to say, although my position would be that the net result is essentially one and the same. It looks like the economic structure is very similar to a loan with a guarantee, but the other way around. Except that, I guess, if there's a loan to the grocery and it's guaranteed by the shareholders, the shareholders may have certain defenses on a guarantee that would be a little different than if it's a loan directly to them. That's probably true, Your Honor. I don't think there's anything in the record suggesting that was the reason this was done this way, and I don't know if that's the reason the loan was done this way. There's nothing in the bankruptcy law that prohibits doing something this way in your position. Not that I'm aware of, Your Honor. When the loan was made to the shareholders, I just wanted to clarify one other thing. The loan's made to the shareholders. The shareholders give the money to the company. Is that a contribution of capital? Or how did they give it to the company? No, no, Your Honor. How it happened, in fact, is the loan proceeds were advanced by the bank directly into the debtor's bank account. The shareholders never touched this money. I understand, but then what was the legal accounting treatment of that advance? Between the shareholders and the debtor? Right. Was it viewed as a contribution of capital or a loan or what? I'm not sure there's any evidence of the record one way or the other, Your Honor. I don't want to know if it's not in the record. Okay. The other thing that I was curious about was the shareholders, they get the obligation on the loan. The money goes to the debtor. Correct. But the bank gets the secured interest in some assets of the debtor. Correct. Which is part of the deal. The shareholders knew about that. Absolutely. Part of the way it was structured with the bank. Your Honor, this is a second loan. There's already a loan that's no longer part of this appeal between the debtor and the bank directly. They wanted to do a second loan. They decided that they wouldn't make the loan directly to the banks. They made it to the shareholders. But the purpose, the undisputed purpose of the loan was to fund the debtor's business operations. Now, later on when they give the accounts to the shareholders in exchange for $125,000, is that what it is? Correct. $125,000, Your Honor. That's paid over to the bank. Does the bank have a further lien on those accounts once they're transferred? Or does the bank's lien just go to the $125,000? I'm not sure I followed the question, Your Honor. The bank had a secured interest in? The bank had a secured interest in securing a $150,000 debt. And they had a secured interest in all accounts of the? That's correct. So now when the accounts are sold for funds, I take it the bank's security transfers to what's received for the accounts? The bank has a security interest in the proceeds of the accounts. That's correct. The bank's security wouldn't follow? The bank has a remaining security interest in any proceeds from other accounts. Right. But it wouldn't follow the accounts that the shareholders took? No. In their hands? No. The bank would get? No. They paid the bank $125,000 essentially. I got it. I understand. All right. I understand the situation. Okay. So that's the factual issues, and they're interesting, but I don't think that's why we're really here today because I don't think the facts are really in serious dispute. There's a whole bunch of cases in this area. I cited a law review article in my brief, the Bankruptcy Law Journal, and it's a real long article. And the guy at one point says the cases on these three-party relationships are hopelessly confusing, and I kind of agree with him. But in any event, all the cases start out with the proposition that what the court is supposed to do is look at all the facts and circumstances and see if the debtor received reasonably equivalent value. What the cases say is you do a balance sheet test. You look at what went in and what went out. Well, if you apply that test here, just that test, we're going to win this case because what went in is $150,000. It's undisputed. $150,000 of the bank's money went to the debtor. What went out was $150,000. It's a wash. We don't stop there, unfortunately. The BAP didn't stop there anyway. The BAP went another step, and the BAP focused on a line of cases which involved this tripartite relationship. And to be fair, there are a number of cases out there that involve this tripartite relationship, and this is where you have essentially dual loans. You have a situation where the bank in our situation makes a loan to a third party, shareholders or whatever, and then the debtor subsequently pays back the bank, and in doing so, the debtor, dollar for dollar, pays back another loan, a distinct loan, that it has with the third party. There are a number of cases out there that hold that that kind of dual loan situation gives rise to reasonably equivalent value. And I have no dispute with that. Certainly, that dual loan situation does give rise to reasonably equivalent value. However, that's not the only way you can establish reasonably equivalent value, and I think what you have to do is go back to the statute that is involved here. It's 548, parent small d, close parent, parent two, close parent, parent a, close parent. That's the statute that defines value in the reasonably equivalent value context. And what that statute says is there's two types of value. There's satisfaction of a debt. That's the dual loan situation we just talked about where when the debtor pays one loan, it satisfies the debt. But also, another way of establishing value is property, and my argument is that's what we have here today. We have the property going directly from the bank to the debtor. If the debtor gets the property, the $150,000, then the debtor has obtained reasonably equivalent value. As I say, there are a number of cases you're going to hear about from my opposition here today that deal with the tripartite dual loan situation. What's interesting about those cases is none of them say that that's the only way to establish reasonably equivalent value. They all say that the dual loan that we've talked about does establish reasonably equivalent value, but none of them say that that is the only way to establish reasonably equivalent value. On the other hand, I've cited a number of cases in my brief where we don't have the dual loan situation, and yet the court has found reasonably equivalent value. There aren't a whole bunch of them, but there's some, and I think that fits right in with the argument I just made. When you go back to the statute, these are cases where the debtor received property as opposed to satisfaction of a debt. We have the Evans Potato case cited in my brief. We have the Siccarelli case that I decided last Friday, I believe, and I provided the court with copies yesterday. We have the Guerrera case, and we have the Mail v. Pioneer Bank case. In each of those cases, the court does not focus on any type of dual loan situation. What the court focuses on ñ sorry, Your Honor. I'm sorry. Well, I'm thinking when you speak of these transactions as being so unique, I think both parties are asking us to resolve this on the law. You say there's no question about the fact that the bank delivered the proceeds of the loan directly to the debtor. That's correct. And I have seen nothing that challenges that. But how do we ñ first, we know that the bank would not have made the loan to the debtor. Excuse me? The bank would not have made the loan to the debtor. The bank did not make the loan to the debtor. It did not have, and refused to do so. With all of its collateral capacity, it said, you're not getting this loan. Right? I don't recall the specific record on that. We do know it refused to loan the money. We do know that that's correct. The loan was made to the shareholders. And they say, we'll borrow the money. And the bank says, yeah, we'll loan it to you. Now, where does this security crank in? Is there anything in this record that says the bank would never have done it without this security? Absolutely. The affidavit of Paul Weingartner, excerpts of record, page 331. It says that the bank would not ñ Well, if it doesn't say that specifically, giving the inferences of that affidavit, there's no doubt I'd get there, Your Honor. Well, there's no doubt you'd get there. But I'm asking, is there any evidence that this bank would not have made this loan without this security? When the affidavit says the loan was made in exchange for the security, I believe the clear inference is they would not have made a loan without the security. That would require a finder of fact to decide. Well, then let's send it back to Judge Steiner. All right. But the point is, the point is that there's a lot about this transaction we don't know. Okay. Is that true? I guess that's a fair statement. And under Washington law, if nobody had paid this debt, what would the remedies of the bank have been? Under Washington law, the bank had a security interest in the assets of the debtor. It could have foreclosed upon those assets. Without suing the debtors? I believe that is Washington law. I don't think you have to ñ as a practical matter, the bank always would sue the debtors as well. Well, could they do ñ do we know under Washington law what they could have done with this security if somebody hadn't voluntarily liquidated it and given them the money? What could they ñ what were their remedies? Can you ñ do we know? I'm not sure I do know the absolute answer, but I believe that when a bank is in that situation, it has an option to do either. It can sue just on the note and ignore this collateral until later, or it can go after the collateral directly. Go on after the note? At what point ñ is there any point in here at which the debtor is a volunteer? That's what I'm groping for. Well, that's the other side's whole argument here. That's what they want the court to believe. I want you to ñ But no, I don't believe there is any volunteer issue here, Your Honor. If you look at the affidavits and the facts, it's clear the purpose of this loan was always to go to the debtor. There was a direct exchange. There's no volunteer ñ there's no chance this money was never going to go to the debtor. But that doesn't solve the problem. It's the status of this security that's really the issue. We don't have any problem where it's going to go. The shareholders can ñ Well, the security, though, is given in exchange for the money. Okay. Right? And the evidence we have of that is the affidavit of this bank office. Well, and on the controverted affidavit. That it was given in exchange. That's correct. Okay. And I think it says ñ I'm going to read the affidavit for rebuttal. I think it says we would not have made a loan without it. But didn't they ñ at least as I'm understanding, I haven't read that affidavit. The bank is getting, in exchange for their money, both the security in the accounts and the obligation of ñ No doubt about it. The bank got both a note and a security agreement. They're getting a ñ I mean, it seems to me it's the opposite of what probably happens usually. I think that's a fair statement. It's a great loan to the company with a guarantee by the shareholders, but it comes down to the same thing economically, except for some potential slight legal differences that aren't really ñ don't seem to be material. An interesting case, the C.L. Carthage case, Your Honor, at 70 Bankruptcy 928. Similar exact situation or similar situation. We have a president of a bank that takes ñ or excuse me, a president of a debtor that takes a loan from a bank and contributes the loan proceeds to the debtor. The debtor uses them to fund business operations. And what the court says there, it goes through an analysis, as you just did, Judge, and says it's essentially the same thing. It's two ways of doing the same thing. What the court also says in that case, I'm happy to inform you, is at the very end it seizes on this distinction I'm trying to make, that you have property or satisfaction of debt. And the court in that case at the very end says it may not make a difference whether the debtor corporation actually owes a debt to the stockholder so long as the money or property that gave rise to the stockholder's debt was in fact received by the corporation. That case is recognizing that there's two ways to establish reasonably equivalent value, the tripartite dual loan reduction of debt, but also in situations where the debtor actually receives the property. What is the harm to these shareholders or to these creditors of the bankruptcy? That's what we're looking out for here. What the BAP found was that the harm was that it created an additional risk to the unsecured creditors that they would not be paid because the secured interest. That's what the BAP said. That's what the BAP said. But the BAP ignored the fact or refused to recognize the fact that these bankruptcy creditors got the advantage of the $150,000 that my bank stuck into that debtor. It's a wash again. There's no additional risk. In fact, some people would probably think $150,000 in cash is better off than the accounts. I agree, Your Honor. $150,000 secured interest in a bunch of accounts. Plus, that $150,000 was not all that certain, was it? Absolutely. It's not the best loan situation this bank's ever made. We aren't sure we're going to get the $150,000 back, yet we've advanced it. In fact, I haven't gotten it back and may never. That's right, Your Honor. I'll save the risk. The problem here is the bankruptcy judge, was that Judge Steiner? Yes, it was. He said this security is okay. He said. What was the motion he granted? The opposing side had moved to avoid the transfer. They granted the security interest on both a preference ground and a fraudulent conveyance ground. Judge Steiner said no preference, but he said very succinctly and without a great deal of analysis, it is a fraudulent conveyance. And then the BAP went much further and came up with this tripartite relationship argument and used that to uphold Judge Steiner. Okay. All right.  Thank you, Your Honor. May it please the Court, my name is Arnold Willig of Hacker & Willig, and my firm represents the bankruptcy trustee, Ronald Brown, in this matter. I think just for a point of clarification, there is evidence in the record that the insider of Hacker & Willig, Northern Merchandise, stated in his own declaration in opposition to summary judgment, and I would direct the Court's attention to excerpt of record number 20 at 247 and paragraph 3 of his declaration. Insider? Who are you referring to? Mr. Weingartner, Paul Weingartner. His declaration? Yes. He was one of the shareholders of the debtor. And if I may, he states, the bank ultimately agreed to make the loan in the amount of $150,000 directly to the shareholders of Northwest, or excuse me, Northwest Merchandise. He states this company should be Northern Merchandise. Myself, Benjamin, or Paul Benjamin and Stephen Comer, with the understanding that the loan proceeds would be contributed to the company and utilized for business purposes. Now? So the company is going to get $150,000. You know, why shouldn't the bank be able to get security for that? I don't really, I'm having trouble understanding the bank's position here. It seems like when the company gets from the shareholders $150,000, which the bank disbursed directly to the company, it's getting more than the value of the secured interest in those accounts. Yeah, I. Accounts could never be worth, the security interest maximum value is the amount of the security interest, but if there are problems of collection of those accounts, the market value is less. Yes, Your Honor, that is true to an extent, although the security interest that the bank received was in excess of $150,000. It basically received a security interest in all of the debtor's assets, which included inventory, accounts receivables, cash in the bank, et cetera. It had a security interest covering more assets, but it was only to secure a $150,000 debt, right? Yes, although, and I think that that is an important distinction to make. The purpose of the security or collateral is to secure an obligation, and here the debtor, Northern Merchandise, had absolutely no obligation to either the bank or to the insiders, these shareholders who made this contribution. But it's part of the understanding of it's going to get the funds that are loaned to the shareholders. Yes, it's going to get those funds. If it gets those funds, the most it can ever lose are the amount of those funds. The most Northern Merchandise could lose? Right. The most it can lose with the security interest is the amount it's getting on day one, and it's got the use of the funds until they're ever collected. Well, that's, although. To me, it seems like a bizarre ruling. I could be totally wrong, and I'll study these cases more, but it looks to me like the bankruptcy judges here are trying to get something for the creditors, for the general creditors at the expense of a bank that has a right to a secured interest. If we don't honor an interest in this setting, and we call it fraudulent, then it's going to make it harder for banks to loan money to struggling companies. If they think if they loan money to a company that's struggling and they get either a guarantee of the shareholders or they do it this way, which is just a different form, but the same thing is they're going to get beaten out of it later. It's just going to be really harder for companies to get these kinds of loans when they're not doing so great. Well, I would respectfully disagree with you, Your Honor. To a large extent, there are mechanisms and methods by which these loan transactions can be properly documented. For reasons known only to the bank and to these insider shareholders, they decided not to have the bank or, excuse me, the debtor be either a maker of that promissory note or a guarantor of that promissory note. But why do they have to do it that way? Well, there might be internal reasons. For example, the ---- It seems like it's a better deal for the debtor if it is just giving a security interest in its accounts rather than be a guarantor. Well, a debtor is entitled, though, to a capital contribution from its shareholders. It is entitled to that. It's entitled to it? It's not ---- it doesn't have any legal right to force shareholders to contribute more capital? No legal right to force it. But if it's ---- the shareholders deem it in the interest to continue their corporation, then that capital contribution should be required or ordinarily is required. It's a permissive thing. Shareholders can always contribute more capital. Or they can determine ---- They can do that any time. But here they were ---- this deal was they were going to borrow the money from the bank and contribute it to the company. Yes, and it ---- The company gets the $150,000. So how is it defrauded by giving a secured interest? That's what I'm trying to understand. Well, it comes down to the nature of the obligation, if I can summarize it as simply as possible. I don't think the only one here has got this problem. No, no. You might want to argue to the other members of the panel. I have a similar problem, but, you know, again, focusing on what is the critical legal question, which is how were the unsecured creditors harmed by this agreement? The BAP said it was this increased risk, and I guess what Judge Gold's point goes to is what increased risk? Well, there's a number of ---- if I could just give the Court a bit of background, factual background. Once the debtor received his capital contribution, it went out to its vendors and obtained a huge amount of inventory. In fact, its liabilities shortly after receiving this ballooned to somewhere over close to $900,000. I believe the record, it shows that there were $875,000 in inventory that this debtor then purchased. Later, and when I say later, I'm talking a month or two after an involuntary was filed and it closed its doors, these insiders, or at least one of the insiders, purchased all of the debtor's assets and effectively got paid enough to pay off this loan that that insider received from the bank. Wait a second. First of all, why do you keep calling them insiders? I'm sorry. That is a bankruptcy term. Yeah. I mean, it doesn't, all right? Okay. I'm sorry. So this is getting corporate law. We understand that they were the three principles of the corporation. Okay. So stop with that. But so what's wrong with that if they purchased all the merchandise, the inventory? Well, they're out there creating ---- in essence, what they're doing is creating ---- You're accusing them of something, a shady thing that's not really before us on the issue that's in front of us. No. The discrete issue that's in front of us is whether or not, really, whether or not there's an obligation and whether or not the bank is entitled to assert what has been labeled this indirect benefit defense to a fraudulent transfer action. And the cases are pretty uniform in holding that. In order to assert this defense, this indirect benefit defense, there needs to be an obligation. There needs to be ---- The debtor pays the ---- Would it change your analysis if there was ---- and Beth is in trouble by this, too. If there was a written agreement between the shareholders and the corporation? Yes. It would change the analysis. Exactly right. Now, would that technicality make a difference? Well, it would have created the obligation. And if structured properly, if the debtors wanted to consider this to be a loan as opposed to a contribution, they would have had a promissory note between the principals and the debtor corporation. That loan would have been carried on the debtor's books as a liability. If their position doesn't depend on it being a loan, it could be a capital contribution. We agree as a shareholder to incur the obligation of a loan and will contribute the funds of the loan to the company as additional capital. But we want the company to give a secured interest to the bank, too. So, I mean, it's covered on both sides. I don't know why it has to be a loan. Why can't there be an agreement that we'll borrow money from a bank and contribute it as capital if the company puts up some security? Well, because the — Wasn't there, in essence, an oral agreement that that's what this deal was? Well, there is an agreement. We don't know the full extent of it. We don't know why, again, they decided to structure it in this manner, although we can speculate, and perhaps the bank didn't fully explain it. Say you can argue anything that's supported by the record. I don't want to speculate. You know, if you can make an argument based on the record, that's fine. Well, again, I would point then to the declaration testimony of Mr. Weingarten, one of the principals, who said the bank simply would not loan the debtor the money. The debtor was deemed to be financially unstable to get a direct loan from the bank. And so, therefore, the bank said, we will make the loan directly to you, the principal. Now, the principal didn't have to contribute that money. The money stayed in — the money was put into the bank account of the debtor, but those principals could have taken that money and used it for any purpose. They could have made a capital distribution to themselves. Oh, you mean before, but the loan proceeds after the loan closed went directly to the debtor's bank account. Yes, under the control of the principals. The three principals, they had no right to the use of that money. They would have. They could have paid the corporate coppers at that point for their own personal use, could they? Well, again, that depends on the statutory scheme for distributions of — The principal probably reached their agreement with the bank, wasn't a part of the agreement with the bank, was going to loan them the money to go be contributed to the company. If they pulled that money the next day out of the company and went to Brazil, would the bank have some claim against them under their loan agreement? Well, that depends — that was what was stated orally in the declaration testimony, that the bank wanted the money or that the principal said that they would take the money and contribute it to the debtor. But even assuming that that was the case, that they then take the money, go to Brazil, the bank's remedy is against the principals, depending on what their promissory note provides. Well, how is the debtor worse off? It's sitting there. It gets $150,000. It gives a secured interest to a bank that the bank can recover the secured interest if they're not paid off by the principal obligor on the loan. How can the bank possibly be harmed by that? Well, the bank is paying essentially on an obligation that was not its own. The bank was taking its own money, be it by capital contribution or the generation of revenues, and paying something, paying an obligation, a debt, that it did not incur. Okay. I got it. I understand. Okay. I'm viewing it as strained. I would suggest you address your arguments to these other two. You might be able to win the case that way. I have another just question. This is your litigation against the bank. And I'm just wondering, do you have any litigation against the principals going on? There was a litigation against, I believe it was Mr. Weingartner. He purchased the debtor's assets. The assets were valued at somewhere in the neighborhood of $400,000. He now lives in Montreal, Canada. We, the state, brought an action against him for the difference between what the bank received and what it believed the value of that collateral was, and that matter was settled. All right. So now aren't you trying to do a double recovery? Absolutely not. Well, I mean, I can understand why a trustee might, but no. Well, there's more than one ways to get at the ‑‑ there might be more than one ways to get at the money, but you can only get the money once. And, again, here the cases all point to an established obligation, one in which the debtor has an obligation to some other creditor out there. Somebody else pays that creditor or makes a contribution, or, excuse me, I don't know what you say, makes a contribution, but pays that creditor. That is what the case is focused on in saying that there's this indirect benefit. The debtor would have had to pay that anyway. And so that's where we get this issue of a wash. To just to kind of wrap this up, just because there's a contribution doesn't necessarily mean there's going to necessarily be an overall benefit. This was something that principles of a corporation are to do. They are to keep their company funded, keep it operational, hopefully keep it solvent to engage in business. That was not the case here. They took advantage of this. There's always a limit, you know. I mean, shareholders don't have to keep putting in more and more money forever. They can always stop. They can. And they can walk away and say that was a failed experiment. But they didn't in this case. What they did is they took the money, made a contribution, pledged their corporation's assets for their personal loan, and then, again, expanded and ballooned this unsecured creditor class. Now, if we'd had this same amount of money moving from the bank to the debtor, and a promissory note and this security arrangement flowing from the debtor to the bank, along with the guarantees of the shareholders, we wouldn't be here, right? We wouldn't be here on the fraudulent transfer issue, Your Honor. We would be here on a preference issue. Okay. Now, we're focused on fraudulent transfer here, and that's what the bankruptcy court held. That's correct. So it's because of this lack of a legal obligation running from the debtor to the bank that makes all the difference in the world, right? It does. And the bankruptcy court undertook to say this is not. They said we're not going to collapse this transaction. We're going to treat it as three transactions, the bank made a loan, two, the shareholders contributed money to the debtor, and three, the debtor gave security interest to the bank. Three different concepts, three segments of what they refused to collapse, right? That's correct. And then they say, as such, in exchange for the security interest, the debtor did not receive reasonable equivalent value. So the receipt of equivalent, reasonably equivalent value is the key to all of this, right? Reasonably equivalent value in exchange for an obligation is correct. Well, you add in exchange for an obligation. Yes. What about in exchange for a security interest without an obligation? That's even better off. The creditor is now better off than giving an obligation and security. In this case, he only has to give security. That's something short of an obligation, you tell me. Isn't that more favorable to the debtor than if the debtor had signed the note and said, yeah, we promised to pay? They'd get away with this without even a promise to pay, right? Well, yes, although, and I need to clarify that. The creditors are not better off because the state assets are being encumbered. The debtor is better off because it doesn't have a promise. It never had to give a promise to pay. But it encumbered its assets. I'm sorry? But it encumbered its assets. But $150,000 encumbered its assets. But it didn't have to give a promise to pay. Well, those assets were valued, we believe, at $400,000. What it sounds to me like is that the bankruptcy court is saying, per se, per se, the structuring of this arrangement in this fashion makes it a fraudulent transfer. And we don't need to know the intent of the bank. We don't need to know anything else. We don't. The bank comes along and says, we gave this money in exchange for this. That doesn't matter. Per se, this is a fraudulent transfer. Is that what it's saying? I can't tell. Well, there's shades of gray there. There's not exactly that bright line. But, in essence, what the court is saying is there was no obligation. The court looked to the. . . Is that what it's saying? Well, I can't answer that directly with a yes, and I'd like to. I can't answer it any other way than a yes. Because it says, it in effect says, we don't care. That affidavit from the bank saying he gave it in exchange for the security, that doesn't matter. It didn't structure it the right way. Structured it this way, it's got to be fraud, right? Fraudulent transfer. Well, in the sense that there's no obligation, that's correct, Your Honor. That's the key. So all we need to know is there's no obligation, therefore it's fraudulent. Well, there's no obligation. That's correct. And that means. . . There's no obligation. Since there was no obligation, the debtor did not receive reasonably equivalent value. Because there's no obligation. Therefore, it didn't receive equivalent value. That's right. That's a major step, is it not, in the law? Well, I think what we're not talking about is the nature of a capital contribution. And the fact is, is that this bank entered into its agreement with the principles. But the bankruptcy court didn't say that the key to this is the fact that it's a capital contribution. The bankruptcy court said the key to it is it's three events instead of collapsing it. Well, I think the bankruptcy court also said that it looked at these principles and said they basically didn't put a dime into this company of their own money. What do you have to say on this? Well, I think it goes to the. . . Well, I think it at least goes to show that they structured this transaction in such a way as that they wanted to use their corporate assets for their own benefit, which occurred. Which is normal, is it? Well, it's normal in bankruptcy court, although it shouldn't be normal in the business world. Thank you, Your Honors. Thank you very much. Brief telegraph? I'm just going to. . . I think Judge Levy hit it right on the head with what the BAP did. They focused entirely on the form of this transaction. They wouldn't have considered the substance of what actually happened. They looked just at the form, and they reached the decision that when you consider the substance, in my opinion, it's ludicrous. Thank you, Your Honors. Thank you, Counsel. All right. Venture Bank v. Brown will be submitted. Okay, we'll take that. Brown v. King County.
judges: Leavy, Wardlaw, Gould